UNITED STATES v. NITRO DEVELOP-
MENT CO.*

(Circuit Court of Appeals, Fourth Circuit.
January 25, 1926.)

No. 2410.

War ⬦⇒14—Use made of plaintiff's property
during war by government for housing held
not "requisition [of] foods, feeds, fuels, and
other supplies necessary to the support of the
army or the maintenance of the navy, or any
other public use connected with the common
defense, * * *" so as to entitle plaintiff
to recover compensation under Lever Act, §
10 [Comp. St. 1918, Comp. St. Ann. Supp.
1919, § 3115⅛ii]; Act May 16, 1918 [Comp.
St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅝a
et seq.]; Judicial Code, § 24, subd. 20, and sec-
tion 145 [Comp. St. §§ 991, 1136]).

Use made of plaintiff's property during the
war by government in erecting upon it houses
for employés of an adjoining explosives plant,
no condemnation or formal requisition of land
having been made, *held* not a "requisition
[of] foods, feeds, fuels, and other supplies
necessary to the support of the army or the
maintenance of the navy, or any other public
use connected with the common defense,
* * *" within Lever Act, § 10 (Comp. St.
1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii),
so as to entitle plaintiff to recover compensa-
tion thereunder; Act May 16, 1918 (Comp.
St. 1918, Comp. St. Ann. Supp. 1919, §
3115⅝a et seq.), and Judicial Code, § 24, subd.
20, and section 145 (Comp. St. §§ 991, 1136),
being unavailable.

In Error to the District Court of the
United States for the Southern District of
West Virginia, at Charleston; George W.
McClintic, Judge.

Action by the Nitro Development Com-
pany against the United States. Judgment
for plaintiff (5 F.[2d] 99), and defendant
brings error. Reversed.

B. J. Pettigrew, Asst. U. S. Atty., of
Charleston, W. Va., and Howard W. Ameli,
Sp. Asst. Atty. Gen. (Elliott Northcott, U.
S. Atty., of Huntington, W. Va., on the
brief), for the United States.

E. B. Dyer and H. D. Rummel, both of
Charleston, W. Va., for defendant in error.

Before ROSE and PARKER, Circuit
Judges, and WATKINS, District Judge.

ROSE, Circuit Judge. In the court be-
low the defendant in error, the Nitro De-
velopment Company, a West Virginia cor-
poration, recovered a judgment for $138,-
833.98 against the United States, plaintiff in
error. The parties will be described as the
owner and the government, respectively.

The judgment was for $100,000, found
to be the fair value on September 12, 1918,

of 245 acres of land in Kanawha county,
W. Va., with interest thereon at 6 per cent.
from that date to March 28, 1925, when the
judgment was entered, less a credit of $709.-
40 paid by the government to the owner on
March 22, 1921, with interest thereon to the
rendition of the judgment.

A brief recital of the facts will be nec-
essary to an understanding of the legal ques-
tions involved.

As a part of its war-time activities, the
government on the 18th of January, 1918,
entered into a contract for the construction
at Nitro, W. Va., of a plant, adequate for
the daily production of a half a million
pounds of smokeless powder. In the near-
ly ten months between that time and the
Armistice, there was spent thereon many
millions of dollars. Thousands of hands
were employed in the work and still others
were to be engaged so soon as the factories
went into operation. They needed houses,
and the price of real estate upon which
dwellings could be erected went up by leaps
and bounds. The land with which we are
now immediately concerned adjoined the gov-
ernment property. It was originally in two
tracts, known as the Gwinn and the Frazier.
The latter contained some 105.9 acres and
had been sold in 1908 for $1,725.00. The
record does not disclose anything as to what
value in pre-war days had been placed upon
the Gwinn land. On March 29, 1918, one
Moore acquired both of them for the aggre-
gate price of $30,000. Something less than
three months later, on June 17th, to be ex-
act, he sold both tracts to the present owner
for $50,000. Different witnesses for the
owner said the entire 245 acres after the
Armistice were worth varying sums rang-
ing from $12,000 to $35,000. The owner
now says that the government had posses-
sion of the land from September 12, 1918,
to some time in the summer of the succeed-
ing year. Since then, the owner has again
had it. During the time the government held
it, some physical damage, not claimed to
have exceeded $2,000 at the most, was
done it.

There was evidence that in September,
1918, the land was worth from $100,000 to
$150,000 in the sense that at that time, and
perhaps for 30 days longer, there were per-
sons who would have paid so much for it.
The president of the owner, a Mr. Baker,
before buying the land, inquired of Mr.
Ketchum, the assistant director of the gov-
ernment plant, whether the government was
likely to want it, and was answered in the
negative. After the purchase, the same gen-

*Certiorari denied 46 S. Ct. 630, 70 L. Ed. ——.

tleman had several other conversations with Mr. Ketchum. In an interview in August, he asked whether the government wanted the property and was told that Mr. Ketchum did not think so. He says that he then said: "Well, that is all right, I am merely asking for information but we don't want to get in the road of the government as I am not in sympathy with some of the things that have been done to hamper the government since this war began, and I want to keep from piling up obstacles. * * * We will sell it to you for less than other people would have done, but if you do not want it, we will go ahead and subdivide it into lots and sell it off either that way or as a whole." This gentleman testified Mr. Ketchum wanted to know what his price would be and he replied they were asking $150,000 for it, but that in order "that we might not be considered as trying to collect an exorbitant price from the government," that I "would discount that price $20,000 and make a price of $130,000 to the government." It seems that Mr. Ketchum thought this price was "rather high," but he said there was no use discussing it because it was the policy of the government to condemn all property needed in such cases, and if they decided to take the property, they would condemn it. Mr. Baker testified that he said to Mr. Ketchum: "It is immaterial to us, but we want to know what you are going to do, because we are going to start selling lots and the survey will be completed very shortly." And then Mr. Ketchum replied, "Don't sell any lots until you see me again." After the survey was started, Mr. Baker says that he again notified Mr. Ketchum. Within a day or two he was called to the plant, and he was there on two or three separate occasions. In one of these interviews, he was told the government would not need more than 100 acres. He replied: "We cannot sell you 100 acres. If we sell you any of it, we will sell you all of it." And received the answer: "We cannot tell you definitely yet; maybe we will need all of it." Mr. Ketchum further said that he would like a letter giving the government permission to go on the property. The reply was that permission to the government was entirely unnecessary inasmuch as it had notified the owner that it was going to take it and settle in condemnation proceedings, and it was up to the owner to get out of the road, and it certainly would not attempt to hinder the government. A short time thereafter, it was testified the government went on the land,

made a survey of it, placed material on it, and erected some sheds or other temporary structures.

In one of the later conversations with Mr. Ketchum, the latter said that it was his understanding that condemnation proceedings had been completed and that the papers were on their way. After the Armistice, Mr. Ketchum told Mr. Baker that the government was going to turn the land back to the owner, whereupon Mr. Baker asked, "Do you think that fair treatment?" and Ketchum replied: "No, sir; I think that you should have something. I think the government will treat you fairly." It is proved that the government did consider condemning the property. On October 24, 1918, the Assistant Secretary of War advised the Chief of Ordnance to that effect, asking him to send along, with a memorandum requested from him, a letter formulated by the Chief of Ordnance for the signature of the Assistant Secretary of War to the Attorney General, requesting that the proper steps be taken for the immediate condemnation of the land in question. Nothing more was ever done in the matter, because a few days later the Armistice came.

The owner made out and subsequently presented to the War Department Board of Appraisers a claim for $90,000 damages. It stated that the engineers for the government, in September, 1918, went on the property owned by the petitioner, staked it out for the purpose of building houses, and within a short time had built various structures for the use of contractors and had placed on the property 30 or 40 carloads of bricks, besides a great deal of building materials, and, in fact, had taken absolute and complete charge of the entire property, and in doing so obliterated and destroyed the work done by the owner, at great expense, to subdivide its property. In this claim which was dated December 29, 1918, it is stated, contrary to the owner's present contention, that the government had then abandoned and removed its material from the property, and that the property reverted to the owner in a badly damaged condition for farming land, with no demand whatever for lots. The petition said that lots could have been sold during August and September for at least $100,000, but that by the action of the government the owner had been deprived of net profits that would have arisen from the sale of the property to an amount of at least $90,000.

On the 29th of June, 1920, the local Board of Appraisers awarded the owner $6,560.92.

of which $1,255.92 was for the damage done by the destruction of the surveying work, $275 for the restoration of ground and fences, $1,280 for rental for the land, and $3,750 direct loss on the lots which had been sold but which, in consequence of the government's action, had not been paid for. This finding of the local Board of Appraisers upon review by the War Department Claims Board was reduced to $945.87. From this award the owner appealed and put its damages at $108,365.92, itemizing them as

| | |
|---|---|
| Loss cost of survey | $ 1,165.92 |
| Destruction of fences | 250.00 |
| Damage from digging of test wells | 50.00 |
| Loss of sales contracts | 3,750.00 |
| Interest for 1 yr. on $50,000 | 3,000.00 |
| Taxes for 1 yr. | 150.00 |
| Loss in excess of market value over cost price at time of taking | 100,000.00 |

In this petition, the owner asked: "That in view of all the facts appearing, the appeal section may review this case and take the necessary procedure to secure an allowance to this petitioner of at least the amount originally recommended by the local investigation board at Nitro," $6,560.92.

After consideration of this appeal, the War Department adhered to its finding of $945.87. The owner declined to accept that sum and was paid 75 per cent. of it, or $709.40. This suit was instituted on the 8th of January, 1923. A jury was waived in writing, and the learned judge below held that the property of the owner had been taken by the government on the 12th of September, 1918, that the proceedings were under the tenth section of the Lever Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii), and that it was entitled to be compensated for the fair value of the land on that date, which he found to be $100,000. This finding was made and judgment upon it entered, although it is certain that the government had never directed the condemnation of the land, that no formal requisition of it was ever made, and that neither Mr. Ketchum nor anybody else who had any conversations or transactions with the owner ever had any authority either to condemn or to requisition it. It is clearly established that otherwise than as a temporary convenience for the contractors constructing the plant at Nitro, the only use anybody connected with the government ever expected in any event to make of it was to erect upon it houses for the persons employed and to be employed at Nitro. The Act of May 16, 1918, 40 Stat. 550 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅝a et seq.),

passed a month before the owner bought the land and nearly four months before the government is said to have taken possession of it, in express terms provides what an owner who was not satisfied with the price the government was willing to pay for land taken to provide war housing should do. He could take, if he chose, 75 per cent. of the valuation the government put upon it and sue for the balance, under the provisions of paragraph 20, § 24, and of section 145 of the Judicial Code (Comp. St. §§ 991, 1136). That is to say, he had to bring his action in the Court of Claims unless he sought to recover not more than $10,000 when he had the option of going into the District Court. It is obvious that this statute affords no support for the instant proceeding. When the owner filed its original declaration, it seemed very uncertain as to what was the statutory authority for it. Shortly before the trial, however, it so amended as to make it clear that it relied upon the tenth section of the Lever Act. The learned judge below held that it was justified in so doing. It will be noted that the Lever Act became a law nine months before the war-housing statute was enacted. Seemingly, the latter would have been unnecessary, had the former covered such a case as that with which we are now concerned.

The primary purpose of the Lever Act, as an inspection of its first section (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛e) clearly shows, is not concerned with the construction either of ammunition plants or of houses for those who might work in them. It read: "That by reason of the existence of a state of war, it is essential to the national security and defense, for the successful prosecution of the war, and for the support and maintenance of the army and navy, to assure an adequate supply and equitable distribution, and to facilitate the movement of foods, feeds, fuel including fuel oil and natural gas, and fertilizer and fertilizer ingredients tools, utensils, implements, machinery, and equipment required for the actual production of foods, feeds, and fuel, hereafter in this act called necessaries; to prevent, locally or generally, scarcity, monopolization, hoarding, injurious speculation, manipulations, and private controls, affecting such supply, distribution, and movement; and to establish and maintain governmental control of such necessaries during the war. For such purposes the instrumentalities, means, methods, powers, authorities, duties, obligations, and prohibitions hereinafter set forth are created, es-

tablished, conferred, and prescribed." The tenth section authorizes the President to requisition "foods, feeds, fuels, and other supplies necessary to the support of the army or the maintenance of the navy, or any other public use connected with the common defense, and to requisition, or otherwise provide, storage facilities for such supplies." Land is not a food, a feed, or a fuel; nor would it seem that bricks, bath tubs, etc., are supplies of the sort for which the act authorizes the requisition of storage facilities. During the war, the government had need of much land and a number of acts were passed to facilitate its prompt acquisition. So far as we know, in every one of them in which the permanent ownership of the land, as distinguished from its temporary use and occupation, was sought, express provision was made either for condemnation or for passing a fee-simple title to the government in other ways. Reference may be had to some of them. Act of October 6, 1917, 40 Stat. 372; Act of March 1, 1918, 40 Stat. 438, 439 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 8146t); Act of April 26, 1918, 40 Stat. 537, 538 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2804bbbbb); Act of May 16, 1918, 40 Stat. 551. All of them were subsequent to the Lever Act, and many of them would have been superfluous if its tenth section was entitled to the broad construction now contended for:

It is certain that the government was preparing to condemn the owner's land, and it is equally clear that no requisition for it had ever been made. The government's entry upon the land was with the consent of the owner, who then expected that the United States would proceed to condemn, as it doubtless would have done had not the signing of the Armistice made smokeless powder a drug on the market. It is true that the owner, if it had not believed that the government was going to buy the land might have sold the whole, or the larger part of it to other people and in that event, the loss which the sudden collapse of Germany caused would have fallen upon those who had been unlucky enough to buy from it, but they would have had no claim upon the government for reimbursement, and it would seem to be in no better case either in law or in equity, except as to such sum as in justice and in good conscience may be due it for the government's temporary use and occupation of the land, including therein, such physical damage as may have been incident thereto.

It follows that the owner was not entitled

to recover under the Lever Act. It might have sued upon an implied contract, to pay what the use and occupation was reasonably worth, but if it claimed more than $10,000 as it did, such action could not have been brought in the District Court. We have not considered whether it would be possible, at this late day, for the owner by amending its claim to bring it within the jurisdictional limit imposed by statute upon the court below and on that question we intimate no opinion. It is, however, clear that the judgment must be reversed and the case remanded for such further proceedings as may be had consistently with the views herein expressed.

Reversed.